Case No. 20-3432 from the District of North Dakota, ALPS Property & Casualty Insurance v. Legacy Steel Building, et al. Legacy Steel Building, et al. My name is Paul Sortland. I represent Legacy Steel. It's Principal Wayne Anker and his brother Bruce Anker in this litigation. The issue here involves a legal malpractice insurance policy, which of course is a claims-made policy as all such insurance policies are now. And it goes beyond that and the definition of claim has changed from what we normally consider a claim to be any reasonable basis why the attorney might get sued. When we go to the history of this case, it's our position before this Court that Mr. Bredahl did not have any reasonable suspicion prior to 2018 that he would be subject to a lawsuit for his involvement here. I think I understand the facts, but I haven't studied the record thoroughly. The one thing I'm not crystal clear on is whether Mr. Bredahl knew the results of the trial when he filled out the October 2017 application. The record's unclear at that point. He certainly knew the trial had been held and the legacy was not represented, right? Correct. And he had been on the Court's communication list since day one. So why, even if the record's unclear, do we need a trial on that point? Well, I'm not sure that's dispositive. Let's assume it is. You're here fighting a summary judgment, right? Your big pitch is this has to be tried. Absolutely. So I'm asking you, if that's a dispositive question, do we need a trial on that or is the record clear? I think we need a trial on that. Mr. Bredahl took the position that while he may have received these communications, he didn't look at them carefully because he never considered himself the attorney for the anchors or for Legacy Steel. Did he have a written agreement with them as to what he was doing in this case? No. That's a clear violation of the rules of professional conduct, right? That was one of our contentions against him in the legal malpractice case. Yeah, that's true. That's one reason that gets us here as well. We believe the insurance company should cover him under the circumstances of this case. I think if we get into the history of this a little bit, that helps us out. In August of 2015, Elite Inspection sued Legacy, as well as Wayne and Bruce Anker, for breach of their promise to supply and build a steel structure. Legacy's position was that it only sold metal parts and promised no construction. This is a building that's going to be constructed out in Williston during the high point of the oil boom. In September 4, 2015, a first attorney approached by Legacy served an answer denying liability. But in North Dakota, same as Minnesota, you don't have to file it, and there was no case filed at that time, even though the summons and complaint, as well as the answer, had been served on each other. September 29, this attorney files an amended answer to the complaint, asserting that Legacy did not promise to construct the building, but Legacy and this attorney part ways because of a dispute between the attorney and Wayne Anker. Now, Bredahl had been a longtime tenant in a building owned by Legacy. Our position is on October 1, 2015, Legacy approached Bredahl to represent it. There is evidence of a $5,000 payment from Anker and Legacy to Bredahl. But contrary to the district court's findings, Bredahl never did admit that was for this file. He'd done a number of matters for Legacy over the years and up to that point. For the whole term of this trial— was about representing them in this very suit, right? There was contact— In February 2016, right? In February 2016? Uh-huh. That was a second phone conference. And the way Bredahl described these is he found out about these at the last minute. They'd come over to his office, say, we've got this phone conference. Bredahl gets online. He tells the court he's not representing Legacy. In this February 26, 2016 conference, he tells the court he's suffering from a progressive neuromuscular disease, which is true, he found out. And the court enters no scheduling order at that time. So that's a second phone conference. Like I say, during this whole time period of the trial— You think it was about representing them in this suit, right? That's what the court below found and what the record says. That's the only fair inference. Bredahl's position is that he was only representing them, if at all, on a temporary basis. Well, counsel, you've got to have an agreement for that to be the case. You know what the presumption is that common law— Let me finish. That common law in every State until about 10, 20 years ago, if you got in a case, you were in a case. You were either in or out of the case. And then, of course, limited representation came along, which requires consent and agreement. So, my goodness, if you're on the phone talking about the case, you're in the case, right? Well, that wasn't the position taken by Bredahl at the time. And neither Bredahl nor that subsequent attorney who was contacted Friday before the trial started had a written agreement. And that was part of our claims against them in the legal malpractice suit. The claim of Bredahl is there was no representation. He made it clear to them. He was never—he never filed a notice of appearance with the district court at the first discovery conference— I'm sorry, scheduling conference on December 30, 2015. That, again, was they come over to his office the day of the hearing, advise him he needs to get on the line. He advises the court that he's not representing Legacy, but temporarily they're on its behalf. And he tells the judge he's not going to be representing Legacy and the anchors. There was a notice of trial issued. And later in March 2016, there's a motion for failure to provide discovery. There's no response. The motion's granted, limiting discovery at trial. On October 1— All these are served on the attorney, right? Yeah. Served electronically and— Yeah, but on the attorney. Yeah. It was served on him and it was also served on the previous attorney and whoever else had a connection. Correct. But in the meantime, ELPS issues an insurance policy for 2016 to 2017, October 1. On March 8, 2017— What seems to me a fact you have to deal with is Bredahl's March 21, 2016 letter to Legacy. And my reaction was when Wayne met with Bredahl on March 10, 2017 to discuss the impending trial, which they've both just learned about, how could Wayne think that Bredahl was representing Legacy, given that March 21 letter? Yeah. That's just not credible to me. Well— He said, I can't do this physically. Right, right. Legacy denies receiving that letter. Bredahl had pretty good grounds that he did send the letter. So that was our position in the underlying lawsuit. So what happened then on March 8, 2017— I mean, it was addressed to the operations manager, right? I think so. Well, yeah. And we have an affidavit from him. I didn't get it, or Legacy didn't get it? I think so. Was it— No, it was something like that. I can't remember his name, but it was specifically to his attention, and he was effectively Legacy for these purposes. Absolutely. And so the owner would have to know. The owner—if Wayne was in charge, as he apparently made it sound like— Well, that was one of the issues litigated in the underlying case. We eventually settled for— I was going to ask, were there terms of another shooter in the record? I don't believe so. On March 8, 2017—this was just before the trial— Bredahl received two emails from the clerk's office. The first one asked about trial readiness. Nothing had been filed by Bredahl this whole time. Nothing had been filed on behalf of Legacy. The answer only came in as an attachment to the other side's attorneys' affidavit for that motion. But a few minutes later, the clerk sends a second email to Bredahl, stating the clerk's office was aware that Bredahl, quote, had withdrawn from the case. Now, keep in mind that he'd never filed a notice of appearance, but the clerk recognizes that Bredahl had withdrawn from the case. Was the clerk deposed? I'm sorry? Was the clerk deposed? No, the clerk was not deposed. As to why he used that word. Yeah, no. I mean, the only other communications we have here from Bredahl are to the court in those two telephone conferences saying he's not representing Legacy. That's my first question, whether Bredahl knew the results of the trial. I think the clerk—okay, we don't know why the clerk used the word withdraw. No, I don't. On the basis for that change of position. I mean, the clerk had treated him as counsel from day one, right? There came a time—at first they were just sending the notices to Mr. Oppengard, the first attorney. There came a time that eventually, I think it went to both, and then I think Bredahl—I'm sorry, Oppengard got his name taken off. So, anyway, this trial coming up, on Friday, on March 10th, I'm sorry, March 8th was the Wednesday, March 10th, he's aware that this trial is coming up and Legacy doesn't have counsel. So he discusses the case with Wayne Anker. During that conference, he contacts an attorney from Grand Forks to prepare a motion for continuation, and he agrees on the condition that the motion to continue is granted. On March 13th— So at that point, Bredahl knew when the motion to continue was denied that Legacy was otherwise unrepresentative. He knew that Legacy was not representative. I'm not sure when he knew the motion to continue was denied. I thought it was March 13th. Well, it wasn't filed until March 20th, so I was a little fuzzy that way. Anyway, on March 13th, nobody's in Williston. You're saying the motion to continue was effectively denied after the trial was held? That's the way the paperwork looks. I think there's a— You know, that's not the real world. Well, this is what happened. The court denies the motion to continue. Here's evidence and issues judgment. The order denying the continuance in order for judgment are issued on March 20. I believe he orally denied it at the time of trial and just proceeded to hear the evidence. When you believe that, what's the basis for that belief? The trial transcript? I'm not sure we had a transcript. There's a basis for that belief. Maybe it was a trial transcript. Counsel, on the 22nd, it's undisputed that he got the order denying the motion to continue and the entry of judgment at the same time, right? No, the judgment was entered on March 21, correct? No, 22 is when Braidall learned, got the order denying the motion and learned of the entry of judgment, right? I'm not sure when he learned. He was really vague on that. But sometime he learned. So on July 20, after this, on 2017, he submits a renewal application to ALPS. He didn't disclose any claim or potential claim, and the policy is renewed on October 1. After that, in the first week of October, Wayne Anker receives a phone call from his nephew, an attorney in Minneapolis, advising him of judgment. They obtain new counsel, makes a motion to vacate. That's denied. They start the appeal and then make an agreement with I can't fit your tongue so fast and look him down. I can't pick up a word. I'm sorry. All right. Well, my time is just about up, so I'd like to reserve the rest of my time, unless you have any questions. No. Well, I do. You said the terms of the Miller-Sugar are in the record. Is it in the record whether the agreement was that the Who was the plaintiff there? Who was the settlement between? Settlement was between my clients and Mr. Bradel, his firm. All right. And did the agreement provide that the only recovery would be from the insurer? Right. We got a judgment against Bradel, but we promised to recover that. The coverage is well known. You agreed to let Bradel off the hook? Frankly, my Miller-Sugar experiences in practice, that would not have been negotiable. Well, that's the way they're normally done. Well, there is no normal in that world. All right. Well, that's the way it happened in this case. You craft them with hard bargaining. And so you could call it a Miller-Sugar question if the agreement was that the Bradel firm would pay X amount and anything else had to be collected from the insurer. That's a Miller-Sugar, right? Right. We know that that was not the case here? Correct. We do not know? We know there's a judgment against Bradel. We've promised to collect that only against the insurance company. That's the terms of the agreement. I'm not following you. So the judgment document says you only can collect from the insurer. So that means that's what the agreement says. Right. That's not necessarily what you had to agree to. Okay. Well, okay. So what's the filing that confirms that? We can tell from the judicial record that was the agreement. I don't believe the agreement itself was filed. There was a stipulation for this. No, they never are. Right. They're usually confidential among the parties. Exactly. So how do we know from the judicial record that that was, in fact, the agreement? You can only collect from the insurer. Well, it's in the record that there's a Miller-Shugart agreement. Yes. All right. So it's not in the record. No. I mean, that won't come up until later on, assuming this matter is remanded. It says an awful lot about the positions of the parties. Well. I can't imagine Legacy was that confident of coverage. Look at where we are in your appellant. So they gave away the whole store? In return for the judgment. To buy a pig and a coverage poke? That's not likely. Unless Bredahl is judgment-proof financially. Our investigation thought that was the case. He's suffering from a neuromuscular disease. He has a hard time. But I thought his law firm was the party also. Yeah. Well, it's basically Bredahl. He does have a daughter working with him now. Anyway, that was our position. Ms. McCarthy. Good morning. May it please the Court, my name is Brooke McCarthy with a law firm. Sorry. Take that off for you guys. With a law firm, Q-Tech Rock, LLP, and I represent the plaintiff and appellee in this matter, Alps Property and Casualty Insurance Company. Before I get into my argument, I did want to point you to the record to response to your question as to whether Bredahl knew about the results of the judgment. Yes. The result of the trial. The result of the trial. So if you go to, it's in the appendix. Appendix starts on page 116 of the appendix and goes on to page 117. And this is a deposition transcript of Mr. Bredahl. The question by Mr. Sortland, order for judgment was signed on March 20th, this was signed on March 21st, correct? He agrees. And here Mr. Pippin provided to you that judgment, Mr. Bredahl agrees, served through Odyssey, correct? If you go on to the next page, and this is Mr. Bredahl speaking, when the judgment and the order for judgment came down, I had those sent to Wayne. And I had specifically told Wayne to get a hold of Tom in Minneapolis. I can't remember Tom's last name. And that he is going to have to try to vacate the judgment under the rules. So that testimony is clear. Thank you. Mr. Bredahl knew of the results of the judgment. So I just wanted to go to that part right there. Is the date March 22? Can you tell the date? Yes. Yep. March 22. Well, so he says he doesn't he was served on March 22nd. And he says, as soon as I received it, I remember receiving it then and immediately forwarding it on. Thank you. So in this appeal, legacy is challenging the district court's order from October of 2020, which properly granted summary judgment in favor of ALPS and determined the professional liability policy issued by ALPS to Mr. Bredahl does not afford coverage for the underlying legal malpractice suit by legacy against Bredahl. The district court's opinion was thorough. It was well-reasoned and it properly applied the correct standard to the undisputed facts should be affirmed. Legacy urges this court to ignore the totality of the circumstances. All of the facts and all of the things that Mr. Bredahl knew prior to applying for the policy and focus on small pieces. Well, did he read all of those filings or did he have notice? But we're saying look at everything. This is a puzzle. It's a big piece. Look at all of the things. I have to say, counsel, that if the record stopped with the March 10 meeting,  Is weak or is not as weak? Because Wayne at that meeting had to know that Bredahl wasn't representing, hadn't been representing legacy. And agreed to go find another lawyer, a timely lawyer. Wayne understood and in Wayne's mind from his testimony is Let me put it this way. We'd need a trial if the record ended with the March 10 meeting. It might be. Sure. And that's the case. So Wayne argues that that letter That totality. I mean everything that happened between February 2016 and that meeting suggests to me the need for trial. It's what happened after that meeting where I think Bredahl had to recognize that there was a risk of a suit. Exactly. And those are the key facts. So we say yes, there are lots of facts leading up to it. Key facts would be that. So that meeting, right? Before the trial, Bredahl calls in his client. They find another attorney. Oh, maybe the attorney can help. We need a continuance. Let's draft some affidavits. Getting this together, right? So that happens on that Friday. Motion for continuance is filed. Bredahl knows the motion isn't granted. Trial proceeds without counsel. Nobody's there. Not even the defendants are there. Bredahl then a few weeks later finds out there is a judgment and there's a judgment of $1 million against his client. That's a key fact. He admits knowing that. He admits trying, passing on that judgment to Wayne, asking Wayne to, well, telling Wayne to go get another lawyer because he needs to get that judgment vacated. So those, so I agree. I think there's, you know, what did he know leading up to it? But the record supports that prior to the effective day of the policy, October 1, 2017, he knew about that trial. He knew about the results of that trial. And that gave him. And when he filled out the application, that's the critical time, isn't it? Right. That's when he had to disclose what he knew. And that was in July when he filled it out and finally submitted in the beginning of October of 2017. So, yes, prior to that time, he was aware of the results of the trial and that being a judgment because nobody showed up at trial to represent his clients. I think it's important, too, to focus on the correct standard to apply here. Even though Legacy gives some lip service to the objective standard, what Legacy really wants this court to find is the standard to apply is that an attorney must know that they are liable for malpractice. Right. So in Legacy's brief, they say, well, he didn't know he was the attorney. He didn't think he did anything wrong. But that's not the standard. The standard is what did he know, what can we determine he knows from admissions, from receiving e-filings in a court, all of that, what did he know and what would an objective attorney, based on that knowledge, a reasonable attorney, have assumed would result. That's the standard. I'm a little confused. Claims made policies are never the easiest thing for me to figure out. Which insurance year was this subject to claims made coverage? So the policy that's at issue here. 16 to 17 or 17 to 18?  So the policy that's at issue. Why wasn't it a claim? Why wasn't this a claim that should have been made in 16 to 17? So he had knowledge of circumstances from which a claim might arise during that period. And the policy requires you to notify the insurance company if you have knowledge. He then filled out an application for the October 2017 to October 2018 policy period. And in that application, he said he had no knowledge, even though he did, of circumstances from which a claim could arise. And what the 2017 to 2018 policy says in the insuring agreements, that's section 1.1.2, is if the insured had prior knowledge of circumstances from which a claim might arise, that claim will not be covered. So let's assume ALPS was not the insurer 2016 to 2017. How would that change this case? It doesn't. But the disclosure wouldn't have been – well, the disclosure should have been made in March of 2017. It should have. So if he was insured by – At that point, let's assume he had a different insurer. So at that point, if he had a different insurer, yes, he would have been obligated to notify that insurer. However, if he switched – so let's say he switched over to ALPS for the 2017 to 2018, right? ALPS application asks that question. Do you have knowledge of any potential claims, any circumstances from which a claim could arise? What if he'd given notice to the prior insurer? Would that carry over somehow? That insurer probably – ALPS would inherit it? Nope. That insurer would be on the hook for that most likely. If he had given prior notice – because typically the insurance policies will have provisions that say if you give notice, a claim will be deemed, made, and reported when you provide that notice. Yeah, that's kind of what I was thinking. So this really should have been a 2016 to 2017 policy year coverage question. It could have been. And ALPS insured him during that time, but he said nothing, right? And so then ALPS – So why does it matter which policy year is at issue here? It does because of the prejudice to ALPS, right? So he had knowledge. Your house is on fire. You know your house is on fire. You don't tell the insurance company. If the insurance company issues the policy, your house burns down, and they have to cover that. If they knew your house was on fire, they would have either not issued the policy, they might have changed the premiums, they might have done an exclusion, but they didn't know. So it was an undisclosed risk. In the fire case, the prior insurer paid. Right. Well, maybe. These are trickier, wouldn't you say? They're trickier, yeah. But the purpose of these policies are to cover an insurance, right, is to cover unknown risks. And here the concern in the policy issues is this was a known risk and not disclosed to ALPS. So then a claim is made, and the reason why it's dealt with under the 17-18 policy because ALPS didn't hear about the claim until it came from Legacy's attorney in January of 2018. So that's when the claim was made and reported. And those terms are important and specific to claims made policies. So here in this case, we have evidence, and the district court correctly determined and went through all of the evidence. Right. So if Legacy urges you to say, well, the court didn't think about this and the court didn't think about that, but it did, and you can go through the opinion and look, and the court considered every single fact that Legacy says the court didn't consider, it did, and it looked at those and said, well, he has knowledge of all these things, and given that, a reasonable attorney would have foreseen that. To answer my question, did your complaint, you sought a declaratory judgment of no coverage. Correct, yes. Did you include both policy years? No, we did not. Not in the initial, because there was no claims made. I guess we could have, but the claim was neither made nor reported under that previous policy. And so, and we filed the coverage action. And it's important to note, too, ALPS didn't leave the insured out to dry, right? So ALPS provided a defense and agreed to provide Mr. Bredahl with a defense in the underlying malpractice case, and it did so. It maintained its obligations under the policy and did so, but, as is its right, filed this coverage action seeking a determination of no coverage. And the district court went through, applied, looked at all of the facts, everything that Mr. Bredahl has admitted, everything he has received, he's presumed to have knowledge of those filings and what was in those filings. Even if he didn't read anything, he still admits, knowing about the trial date, knowing that the trial was coming, having that meeting on March 10 of 2017, knowing the motion for continuance was not granted, knowing there was a trial without anybody attending that trial, knowing there was a judgment, the judgment was for $1 million, urging his clients to go seek a counsel to have that vacated. So even if he didn't read anything, even if he's presumed not to know any of the filings that a court properly served, right? If a court can't assume that an attorney has notice of the contents of a document that's properly served on him, then notice is meaningless, and you can't ever The clerk's e-mail messes up that nifty It's, right, but nevertheless, the court, the court issued the judgment, and so a counsel, the court, everybody still believed that legacy was represented by Breedall, and who knows what the Because of what? Because he was, he appeared at the hearings, No, but how does the judgment show that? It's in the judgment. He says, he names Breedall, he was represented by three separate attorneys, first Oppegaard was the first one, then it was Breedall for the bulk of the case, and then the third attorney was Hanke, who just came in for that small piece to file the motion for content. Did Hanke put in writing that he would accept the representation only if the motion to continuance was granted? He put that in the motion. We don't have any That was in the motion itself. It was. It was in the motion. I haven't seen anything in the record, any agreement specifically between Mr. Hanke and Legacy. We know that Mr. Hanke was on the phone at that meeting, and there were conversations, and presumably when you get called on the Friday before a trial, that's, well, yeah, I can help you out, but there's no way I can get ready for trial over a weekend, right? And so, there were Counsel, that would depend. Don't go there. Go simply to you say it was in the motion itself. Okay. Sorry. Yes. It was in the motion itself, and that's all we've got on that. That's all we have on that. Right. That's all we have on that. So, just to sum up, I have about a minute left, but here we have, the policy has prior knowledge provisions. No one is arguing that those are ambiguous. Legacy isn't arguing that. The court didn't find they were ambiguous. Unambiguous prior knowledge provisions that require that if they're assured it has prior knowledge, there's no coverage. The court looked at those provisions, determined they were unambiguous, applied those provisions to the facts that we have at hand, determined correctly, no coverage for this claim under the policies. And we respectfully believe the district court's opinion should be affirmed. Thank you. Thank you. I'll give you a minute for rebuttal, Mr. Shortland, when we get sanitized. I appreciate the court's focus on the facts occurring in March of 2017, so I think that's critical here. One has to ask the question, why would Breedall... You can take your mask off. Oh, I'm sorry. Why would Mr. Breedall make a claim to the insurance company at that time in March of 2017? His actions here are consistent all the way through of an attorney who hasn't been retained. He did make these minor appearances by telephone at the behest of the client for those two scheduling conferences. I think the moment in time is when he tells Wayne, you better get Tom to get that vacated. Okay? Again, why would that tell him that he should advise his insurance company? He wasn't the attorney at trial from his standpoint. He wasn't the attorney that caused the judgment to be entered. He was a friend who'd represented this company on a number of other things, but not this case. He was never an attorney of record, and that's confirmed by that court's email. Why in the world would you notify your insurance carrier of that? He didn't expect to have a claim against him. He didn't think there was a legitimate claim against him. And other than possible ethical violations, he had committed no cognizable wrong in his mind. So I think that's what we have to look at here. Why in the world would Breedall, given those facts, report this to his insurance company? There are no reasons why he should report it to the insurance company. Sure, he may have known about the judgment, although I think the date is unclear. But it doesn't say he represented the client at the time of judgment. That came as something else. We all have clients who have fired us or something and gone on to get an adverse judgment against them. I don't report those to my insurance carrier, and I suspect most attorneys don't. And under the standard that he's supposed to be acting upon here, that would say that he is not. He had legitimate reason to believe he was not, not only not liable, but also that no claim would be made against him. Thank you. Thank you, counsel. The case is factually tricky to work through and understand why it's contested and the argument has been helpful. I take it under advisement.